```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3

 4
   UNITED STATES OF AMERICA    )    DOCKET NO. 1:07-CR-233
 5                             )
                               )    ATLANTA, GEORGIA
 6                             )    OCTOBER 29, 2008
          V.                   )
 7                             )
   BARIMA P. MCKNIGHT,         )
 8                             )
          DEFENDANT.           )
 9

10
                   TRANSCRIPT OF SENTENCING HEARING
11            BEFORE THE HONORABLE ORINDA D. EVANS,
                    UNITED STATES DISTRICT JUDGE
12

13 APPEARANCES OF COUNSEL:

14 FOR THE GOVERNMENT:     ROBERT C. MCBURNEY
                           CASSANDRA J. SCHANSMAN
15
   FOR THE DEFENDANT:      DAVID R. MACKUSICK
16

17
   COURT REPORTER:         ANDY ASHLEY
18                         1949 U. S. COURTHOUSE
                           ATLANTA, GEORGIA  30303-3361
19                         (404) 215-1478

20

21
   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
22 PRODUCED BY COMPUTER.

23

24

25
```

1                    P R O C E E D I N G S

2  (ATLANTA, FULTON COUNTY, GEORGIA; OCTOBER 29, 2008

3  IN OPEN COURT.)

4          THE COURT:  IN THE CASE OF U.S. VERSUS MCKNIGHT,

5  THERE IS AN OBJECTION TO THE PRESENTENCE REPORT.

6          MR. MACKUSICK, WOULD YOU LIKE TO BE HEARD?

7          MR. MACKUSICK:  I WOULD, YOUR HONOR.  IT'S JUST A

8  SINGLE OBJECTION THAT'S ALL THAT'S LEFT, AND THIS IS THE

9  OBJECTION TO THE TWO LEVEL ENHANCEMENT FOR POSSESSION OF A

10  FIREARM.

11          IT WOULD BE OUR POSITION ON THE FACTS OF THIS CASE

12  THAT ENHANCEMENT WOULDN'T APPLY TO THIS DEFENDANT.  ESSENTIALLY

13  IT WAS APPLIED TO MR. MCKNIGHT.  WELL, I'LL READ IT OUT OF THE

14  PRESENTENCE REPORT.  BECAUSE GUNS ARE FREQUENTLY PRESENT IN

15  STASH HOUSES THAT BMF USED AND THAT MR. MCKNIGHT WENT TO SOME

16  OF THOSE HOUSES.

17          IT WOULD BE OUR POSITION THAT ON THE FACTS OF THIS

18  CASE THE ENHANCEMENT IS NOT WARRANTED.  I KNOW YOU KNOW WHAT

19  THE LAW IS IN THIS DISTRICT I'M SURE.  THE GOVERNMENT CAN POINT

20  TO A MOUNTAIN OF CASES IN WHICH ENHANCEMENT HAS BEEN APPLIED TO

21  COCONSPIRATORS WHO DIDN'T ACTUALLY POSSESS A FIREARM.

22          THERE'S AT LEAST ONE CASE IN WHICH THE FACTS I

23  THOUGHT WERE MORE EGREGIOUS THAN THIS CASE IN WHICH THE

24  ELEVENTH CIRCUIT UPHELD THE DISTRICT COURT IN NOT APPLYING AN

25  ENHANCEMENT.  THAT CASE IS UNITED STATES VERSUS CLAY.  IT'S 376

1   F.3D AT 1296.  IT'S A 2004 CASE.

2           VERY QUICKLY IN THIS CASE CLAY THE DEFENDANT BOUGHT

3   DRUGS FROM RILEY AND PICKED UP DRUGS AT RILEY'S STASH HOUSE.

4   THE STASH HOUSE AND OTHER HOUSES WERE SEARCHED LATER.  FIREARMS

5   WERE FOUND IN ACTUALLY CLAY'S RESIDENCE, RILEY'S STASH HOUSE

6   AND RILEY'S OTHER HOUSE.

7           THE DISTRICT COURT DECLINED TO IMPOSE A TWO LEVEL

8   ENHANCEMENT IN THAT CASE ON THE GROUNDS THAT IT WASN'T

9   REASONABLY FORESEEABLE TO CLAY THAT THERE WOULD BE FIREARMS

10  THERE AND SAID THERE WASN'T SOME SPECIFIC CONNECTION BETWEEN

11  THE FIREARMS AND THE PARTICULAR DRUG ACTIVITY.  ABSENT THAT THE

12  DISTRICT COURT DOES NOT HAVE TO FIND THAT THAT ENHANCEMENT

13  APPLIED.  I'M SORRY THAT'S THE ELEVENTH CIRCUIT SAYING THAT.

14          WE THINK THAT'S WHAT'S GOING ON HERE.  MR. MCKNIGHT

15  IN THIS CASE HIS INVOLVEMENT WAS MOSTLY AS A LOADER/UNLOADER OF

16  VEHICLES AND COUNTER OF MONEY AND WHATNOT.  MOST OF THAT

17  ACTIVITY TOOK PLACE PRIOR TO 2003, AND I MAY TALK ABOUT THIS A

18  LITTLE BIT MORE LATER.

19          AFTER 2003 HE GOT AWAY FROM THE DRUGS AND MORE INTO

20  THE ENTERTAINMENT END OF IT WHICH IS WHAT HE WAS THERE FOR IN

21  THE FIRST PLACE.

22          AS A LOADER/UNLOADER HIS ACTIVITY TOOK PLACE AT A

23  HOUSE CALLED THE GATE ON MT. PARAN ROAD AND AT A HOUSE OUT IN

24  TEXAS, AND AS FAR AS I KNOW NO FIREARMS WERE ACTUALLY RECOVERED

25  AT EITHER OF THOSE LOCATIONS.

1      SO THE ENHANCEMENT IS BASED ON JUST PEOPLE'S

2 STATEMENTS HEY, THERE WERE GUNS THERE AT SOME POINT AND SO WAS

3 MR. MCKNIGHT AT SOME POINT, AND OUR POSITION WOULD BE THAT ON

4 THE BASIS OF THAT IT JUST SHOULDN'T APPLY TO THIS DEFENDANT.

5 IT'S LITTLE BIT TOO TENUOUS.

6      THE COURT:  LET ME HEAR FROM THE GOVERNMENT ON THAT.

7      MR. MCBURNEY:  JUDGE, MR. MACKUSICK IS CORRECT IN

8 THAT THE ONLY ISSUE NOW BEFORE THE COURT OTHER THAN WHAT'S THE

9 RIGHT SENTENCE, A REASONABLE SENTENCE, IS THIS MATTER OF THE

10 FIREARMS.

11      MR. MCKNIGHT DOES QUALIFY FOR SAFETY VALVE, AND HE

12 WAS DEBRIEFED PURSUANT TO THOSE PROVISIONS MONDAY, AND SO I

13 DON'T KNOW THAT'S REFLECTED IN ANY PAPERWORK YOU HAVE, BUT I'M

14 HERE TO SAY THAT HE SATISFIED THAT FINAL CRITERIA, NAMELY FULLY

15 AND TRUTHFULLY DEBRIEFING WITH THE GOVERNMENT, AND SO MAY

16 ADJUST WHAT THE CALCULATIONS ARE BEFORE YOU.  IT'S NOT AN

17 OBJECTION --

18      THE COURT:  SO YOU ALL ARE NOT OBJECTING TO THE MINOR

19 ROLE REDUCTION?

20      MR. MCBURNEY:  NO AND I CAN TALK ABOUT THAT NOW --

21      THE COURT:  NO, YOU DON'T NEED TO. I JUST WANTED TO

22 CLARIFY THAT.

23      MR. MCBURNEY:  BUT HE WILL COME UP, MR. MCKNIGHT WILL

24 COME UP WHEN WE'RE DISCUSSING OUR OBJECTIONS TO MINOR ROLE AS

25 TO MR. HALL.  SO I'LL SAVE THAT UNTIL LATER.  MR. MCKNIGHT

1 DOESN'T NEED TO BE HERE FOR THAT.  IT'S JUST CONTRASTING MR.

2 MCKNIGHT WITH MR. HALL.

3         THE FIREARM, HERE ARE THE FACTS IN THIS CASE.  THE

4 DALLAS HOUSE WASN'T KNOWN TO LAW ENFORCEMENT SO OBVIOUSLY

5 WASN'T SEARCHED, AND BY THE TIME LAW ENFORCEMENT BECAME AWARE

6 OF THE GATE AND WAS ABLE TO GET -- THERE WASN'T A MEANINGFUL

7 SEARCH AT -- I WANT TO SAY THE GATE BUT ONE OF THE LOCATIONS

8 WHERE THE DEFENDANT HAS ACKNOWLEDGED THAT HE ASSISTED FROM TIME

9 TO TIME IN LOADING AND UNLOADING VEHICLES.

10         EVERY STASH HOUSE THAT WAS KNOWN AND WAS SEARCHED IN

11 THE BMF CASE YIELDED MULTIPLE FIREARMS.  EVERY WITNESS WHO HAS

12 BEEN DEBRIEFED HAS SAID THERE WERE ALWAYS GUNS WITH THE DRUGS.

13 WE DIDN'T HAVE THESE THINGS UNGUARDED, AND MOST RECENTLY JUST A

14 FEW MONTHS AGO ONE OF THE LIMOUSINES THAT WAS SEIZED AT ONE OF

15 THE STASH HOUSES WAS RECOVERED.

16         IT WAS SEARCHED BACK IN 2004 OR 5 WHEN IT WAS

17 SEIZED.  NOTHING WAS FOUND DESPITE A DRUG DOG ALERTING, ET

18 CETERA, BUT INFORMATION THAT WAS DEVELOPED IN PREPARATION FOR

19 THE TRIAL OF DEFENDANT DANIELS THAT WE HAD BEFORE YOUR HONOR

20 CAUSED AGENTS TO RELOCATE THIS LIMOUSINE WHICH HAD BEEN

21 FORFEITED AND SOLD THROUGH GOVERNMENT AUCTION, AND BASED ON

22 THIS INFORMATION THEY WERE ABLE TO LOCATE THESE TRAPS.  IN THE

23 TRAPS WAS ABOUT ONE MILLION DOLLARS AND SEVEN SEMIAUTOMATIC

24 FIREARMS.

25         SO MY POINT IS THIS, THERE WASN'T A TIME BASED ON ALL

1   THE EVIDENCE THAT'S BEEN DEVELOPED IN THIS CASE THAT DRUGS AND

2   DRUG MONEY WERE NOT ACCOMPANIED BY FIREARMS.

3         I'M NOT TELLING THE COURT AND IT'S NOT WHAT'S IN THE

4   PSR AND IT'S NOT WHAT'S NECESSARY FOR THE COURT TO MAKE THE

5   FINDING THAT MR. MCKNIGHT HAD A GUN ON HIS PERSON WHILE HE WAS

6   COUNTING MONEY, LOADING MONEY, UNLOADING DRUGS, LOADING DRUGS.

7   OTHER PEOPLE DID AND HE WAS AWARE OF THAT.  THIS WAS PART OF

8   WHAT BMF WAS ALL ABOUT.

9         AND AS A FINAL POINT I'LL NOTE THAT MR. MCKNIGHT'S

10  PRIMARY CONNECTION WITH THE BLACK MAFIA FAMILY WAS ON THE

11  ENTERTAINMENT SIDE.  HE IS A HIP HOP OR RAP STAR.  HE HAS WON

12  AWARDS FOR HIS MUSIC.

13        HE PERFORMED IN AN EFFORT -- PARTLY IN AN EFFORT TO

14  PROMOTE BMF ENTERTAINMENT WHICH WAS PART OF THIS BMF

15  ENTERPRISE.  IT WAS CALLED THE LEGIT SIDE OF IT, BUT IN DOING

16  SO, IN MAKING VIDEOS, ET CETERA, IT WAS NOT UNCOMMON FOR MR.

17  MCKNIGHT TO HAVE ONE, TWO, EVEN THE MOST WE COUNTED IN ONE OF

18  HIS VIDEOS THREE FIREARMS.

19        NOT SHOOTING ANYONE, NO DRUGS IN THE VIDEO.  THAT'S

20  NOT MY POINT THAT THERE'S ANYTHING ILLEGAL ABOUT THE VIDEO.

21  JUST AGAIN FOR THE COURT TO GET AN ESSENCE OF WHAT THE BMF WAS

22  ALL ABOUT.

23        SO WE THINK THAT THIS FINDING IS APPROPRIATE GIVEN

24  WHAT WENT ON AT THESE STASH HOUSES, WHAT THE DEFENDANT HAS

25  ADMITTED TO, YEAH, I WAS THERE WITH THE DRUGS AND FROM TIME TO

1 TIME I'D BE HANDLING THE DRUGS, OFFLOADING, LOADING, ET

2 CETERA.

3          SO IT IS VERY REASONABLY FORESEEABLE THAT THOSE GUNS

4 THAT WERE PRESENT AT THE STASH HOUSES WERE THERE NOT TO BE USED

5 IN ONE OF MR. MCKNIGHT'S MUSIC VIDEO BUT TO BE USED AS

6 PROTECTION FOR THOSE DRUGS.

7          THE COURT:  I THINK THAT THE PROBATION OFFICER IS

8 CORRECT IN SAYING THAT LARGE AMOUNTS OF DRUGS AND STASH HOUSES

9 GENERALLY GO ALONG WITH GUNS.  I MEAN I HAVE OBSERVED THAT TO

10 BE TRUE IN PRACTICALLY EVERY DRUG CASE WE'VE EVER HAD.

11          ON THE OTHER HAND, IT SEEMS TO ME, PARTICULARLY GIVEN

12 THE WEALTH OF INFORMATION THE GOVERNMENT HAS ACQUIRED FROM

13 VARIOUS COOPERATING INDIVIDUALS AND OTHERS WHO WANTED TO

14 COOPERATE MORE THAN THEY DID, THAT IT WOULD HAVE BEEN POSSIBLE

15 FOR THE GOVERNMENT TO GET SOME ACTUAL EVIDENCE INSTEAD OF JUST

16 GOING ON THE THEORY THAT STASH HOUSES NORMALLY INVOLVE GUNS.

17          IT DOES BOTHER ME A LITTLE BIT THAT IN RELYING ON

18 THIS ADJUSTMENT UNDER SECTION 2D1.1(B)(1) THE GOVERNMENT IS

19 JUST ESSENTIALLY SAYING THIS IS THE WAY IT NORMALLY IS, NOT

20 THAT WE HAVE EVIDENCE THAT IT WAS THIS WAY IN THIS CASE.

21          MR. MCBURNEY:  PERHAPS IN AN EFFORT TO EMPHASIZE THE

22 POINT I MAY HAVE GLOSSED OVER THIS, EVERY BMF STASH HOUSE THAT

23 WAS SEARCHED PURSUANT TO A SEARCH WARRANT YIELDED GUNS.  SO

24 IT'S NOT MR. MCBURNEY SAYING DRUGS AND GUNS GO TOGETHER.

25          THE COURT:  DON'T YOU HAVE TO SHOW HERE THAT THE

1  DEFENDANT HAD AN AWARENESS THAT GUNS WERE THERE, THE DEFENDANT

2  THAT'S BEING SENTENCED?

3      MR. MCBURNEY:  YES AND IF WHAT YOU'RE SAYING IS WE

4  DON'T HAVE A WITNESS SAYING I KNOW FOR A FACT THAT MR. MCKNIGHT

5  WAS AWARE THAT THE GUNS WERE PRESENT, WE DON'T HAVE THAT.  I

6  DON'T KNOW THAT THAT'S REQUIRED.  I DON'T KNOW HOW WE WOULD

7  OTHER THAN SOMEONE SAYING --

8      THE COURT:  ONE WAY YOU COULD DO IT WOULD BE SOMEBODY

9  SAYING WELL, I WAS THERE ON THIS OCCASION AND HE WAS THERE,

10  TOO, AND THERE WERE GUNS THERE AND THEY WERE OUT ON THE TABLE

11  OR WHATEVER.

12      MR. MCBURNEY:  OKAY.  THAT'S NOT SOMETHING WE'RE ABLE

13  TO DO TODAY.  IF THAT'S WHAT YOU'RE REQUIRING, WE DON'T MEET

14  THAT THRESHOLD.  I DON'T THINK THAT'S THE RIGHT THRESHOLD, BUT

15  I UNDERSTAND WHAT YOU'RE POINTING OUT.

16      THE COURT:  IS THERE SOMETHING ABOUT 2D1.1(B)(1) THAT

17  HELPS YOU OUT?

18      MR. MCBURNEY:  I THINK WHAT HELPS US OUT IS THE CASE

19  LAW INTERPRETING IT, AND MR. MACKUSICK WAS VERY CANDID.  HE

20  FOUND THE ONE CASE WHERE A DISTRICT COURT SAID MAYBE THAT'S NOT

21  ENOUGH.

22      ALL THE OTHER CASES FROM THE ELEVENTH CIRCUIT HAVE

23  SAID THIS NEXUS THAT I'M ESTABLISHING AND THAT IS ESTABLISHED

24  IN THE PSR IS SUFFICIENT.  MR. MACKUSICK IS SAYING WELL THE

25  FACTS OF CLAY HE THINKS ARE ACTUALLY A LITTLE STRONGER FOR THE

1  GOVERNMENT, HERE'S A COURT THAT SAID THAT'S NOT ENOUGH AND THE

2  ELEVENTH CIRCUIT DIDN'T SAY THAT'S WRONG.

3      BUT THE ELEVENTH CIRCUIT HAS ALSO SAID IT IS CORRECT

4  FOR A COURT IN OUR FACTUAL SITUATION TO LINK THE GUNS TO ALL

5  THE PARTICIPANTS THAT WERE PRESENT AT THAT LOCATION AND THAT

6  LOCATION COULD BE A STASH HOUSE A, STASH HOUSE B, WHATEVER.

7      SO THE ONLY LEAP I GUESS, AND I DON'T THINK IT'S A

8  LEAP, A SMALL STEP I'M ASKING THE COURT TO TAKE IS THIS NOTION

9  THAT THERE ALSO WERE GUNS AT THE GATE.  WE DIDN'T SEARCH THE

10  GATE.  SO THERE AREN'T GUNS THAT WE SEIZED FROM IT.  THAT'S A

11  PLACE WHERE WE HAVE WITNESSES SAYING DEFENDANT MCKNIGHT

12  UNLOADED, LOADED, ET CETERA.

13      WE HAVE PEOPLE SAYING GUNS WERE THERE, BUT WE DIDN'T

14  SEIZE GUNS FROM THAT LOCATION.  SO I THINK THAT'S THE MISSING

15  PIECE.  APART FROM WHAT THE COURT HAS ASKED FOR WHICH IS WELL,

16  WAIT, HOW ABOUT A WITNESS WHO COULD SAY I REMEMBER THIS TIME

17  AND IT'S DISTINCTIVE BECAUSE "X" GUNS WERE THERE, HE WAS THERE,

18  WE DON'T HAVE THAT LEVEL OF SPECIFICITY.

19      BUT WE DO HAVE THE LAYERS OF PROOF OF EVERYONE WHO

20  DESCRIBED THESE SETTINGS DRUGS, GUNS, YOU DON'T HAVE 200 KILOS

21  OF DRUGS AT A STASH HOUSE AND A SLINGSHOT.  THERE ARE GUNS

22  THERE AND NO ONE HAS SUGGESTED THAT MR. MCKNIGHT WAS SOMEHOW A

23  BMF OUTSIDER.

24      THE COURT:  THE CASE YOU ALL ARE TALKING ABOUT IS

25  THAT A CASE INTERPRETING SECTION 2D1.1?

1    MR. MACKUSICK:  YES, YOUR HONOR.

2    THE COURT:  COULD I SEE IT?

3    (PAUSE IN THE PROCEEDINGS.)

4    THE COURT:  I'M REMEMBERING A CASE WHERE I WAS

5    REVERSED FOR ENHANCING FOR A GUN BECAUSE THERE WAS NO HARD

6    EVIDENCE THAT THE DEFENDANT ACTUALLY HAD THE GUN, AND IT WAS A

7    GUY WHO I THINK WAS A RINGLEADER, WAS THE HEAD GUY IN A

8    CONSPIRACY.

9    MR. MCBURNEY:  YOU'D PROBABLY REMEMBER IF YOU WERE

10   REVERSED.  THE PERTINENT LANGUAGE FROM THE APPLICATION NOTE IS

11   THAT IT SAYS THE ADJUSTMENT -- THIS IS THE 2D, ET CETERA --

12   SHOULD BE APPLIED IF THE WEAPON WAS PRESENT UNLESS IT IS

13   CLEARLY IMPROBABLE THAT THE WEAPON WAS CONNECTED WITH THE

14   OFFENSE.

15   THE COURT:  WHERE IS THIS APPLICATION NOTE?

16   MR. MCBURNEY:  APPLICATION NOTE 3 FOR 2D1.1 AND IT

17   STARTS BY SAYING FIREARM AND DANGEROUS WEAPON ARE DEFINED

18   ELSEWHERE.

19   THE COURT:  HOLD ON JUST A MINUTE.

20   MR. MCBURNEY:  146 IS THE PAGE IF YOU HAVE THE BLUE

21   SENTENCING MANUAL.

22   THE COURT:  WHERE ON PAGE 146?

23   MR. MCBURNEY:  PARAGRAPH NUMBER 3 AT THE TOP, IT'S

24   APPLICATION NOTE 3.

25   THE COURT:  ALL RIGHT.  I'M NOT TOO SURE THAT

1   APPLICATION NOTE REALLY GETS TO WHAT YOU'RE TALKING ABOUT.

2          MR. MCBURNEY:  I'D ARGUE THAT --

3          THE COURT:  IT IS IMPLIED THAT THE DEFENDANT KNOWS

4   THE WEAPON IS PRESENT.  IMPLIED IN THAT APPLICATION NOTE.  WHAT

5   THEY'RE TALKING ABOUT THERE IS WHAT DO YOU HAVE TO SHOW TO

6   CONNECT THE WEAPON TO THE OFFENSE, THE DRUG OFFENSE CONDUCT.

7          MR. MCBURNEY:  AND THE GOVERNMENT'S POSITION IS THAT

8   ABSENT THAT SO CALLED SMOKING GUN WITNESS WHO COULD SAY I WAS

9   THERE AND HE WAS THERE AND THERE WAS A GUN ON A TABLE, IT'S

10  MORE THAN REASONABLY FORESEEABLE THAT THOSE GUNS THAT WERE

11  THERE WERE FOR THAT PURPOSE, BUT I DON'T WANT TO FORCE THIS.

12  WE DON'T HAVE TODAY THE WITNESS WHO'S GOING TO DRAW THAT LINK

13  IF THAT'S WHAT YOU'RE REQUIRING.

14         THE COURT:  WE ALSO JUST GOT BACK FROM THE ELEVENTH

15  CIRCUIT SOME DRUG CASES WHERE THERE HAD BEEN A RECENT RULING BY

16  THE SUPREME COURT THAT HAD SOMETHING TO DO WITH WEAPONS.  I

17  DON'T KNOW THAT IT'S 2D1.1.

18         MR. MCBURNEY:  I THINK THAT WAS A 924(C), WHAT

19  CONSTITUTES IN FURTHERANCE SITUATION.  THAT'S MY RECOLLECTION.

20  WHEN I DID A QUERY BASED ON MR. MACKUSICK'S OBJECTION, THERE

21  WASN'T ANYTHING PARTICULARLY RECENT.

22         THE VAST MAJORITY OF THE CASES WERE THE ELEVENTH

23  CIRCUIT SAYING THERE WAS NOTHING WRONG WITH THE DISTRICT COURT

24  APPLYING THIS ENHANCEMENT.  THE ONE OUTLIER BEING CLAY.

25  NOTHING RECENT FROM THE SUPREME COURT ADDING ANY NEW GUIDANCE.

1    MR. MACKUSICK:  YOUR HONOR, I SUPPOSE I SHOULD POINT

2 OUT I THINK CLAY IS THE FLIPSIDE OF WHAT MR. MCBURNEY JUST

3 SAID.  THERE'S NOTHING WRONG WITH THE COURT NOT APPLYING IT

4 EITHER.

5    THE COURT:  SO THIS IS THE CASE WHERE THE DISTRICT

6 COURT FOUND THAT THE COCONSPIRATOR'S POSSESSION OF THE FIREARMS

7 WAS NOT FORESEEABLE TO THE DEFENDANT, RIGHT?

8    MR. MACKUSICK:  THAT'S CORRECT, YOUR HONOR.

9    THE COURT:  AND THE ELEVENTH CIRCUIT AFFIRMED THE

10 DISTRICT COURT?

11    MR. MACKUSICK:  CORRECT.  THEY ADDRESS THE SAME

12 CONCERN YOU HAD EARLIER THAT GUNS AND DRUGS GO TOGETHER.

13 THAT'S QUITE COMMON AND THEY MENTIONED THAT IN THERE, BUT THEY

14 SAID WITHOUT SOMETHING MORE IT'S OKAY FOR THE COURT NOT TO

15 APPLY IT IF THE COURT FINDS THAT IT WASN'T FORESEEABLE TO THAT

16 DEFENDANT.

17    THE COURT:  WELL, I THINK THAT IT WOULD BE

18 FORESEEABLE TO A DEFENDANT THAT A STASH HOUSE WOULD INVOLVE

19 WEAPONS.  THAT'S KIND OF A MATTER OF COMMON SENSE.  SO IF

20 THAT'S ALL THAT'S REQUIRED I THINK THE GOVERNMENT IS RIGHT.

21    MR. MACKUSICK:  I THINK THEY WENT A LITTLE BIT

22 FURTHER THAN THAT.

23    THE COURT:  BUT, AGAIN, AS I SAID WHAT BOTHERS ME

24 HERE IS NOTWITHSTANDING THE COMMONSENSICAL ASSUMPTION THAT A

25 STASH HOUSE THERE ARE NORMALLY GOING TO BE GUNS THERE AND THE

1    PEOPLE WHO ARE THERE ARE GOING TO KNOW THEY WERE THERE, TOO.

2           THERE REALLY ISN'T ANY EVIDENCE IN THIS CASE FROM

3    ANYBODY THAT WOULD MAKE THAT LINK TO A PARTICULAR DEFENDANT.

4           MR. LOVELL:  YOUR HONOR, EXCUSE ME, I HAVE THE NEXT

5    DEFENDANT BUT THIS HAS A TREMENDOUS BEARING ON HIM, AND I HAVE

6    THE CASE THAT I THINK YOU'RE LOOKING FOR.  MAY I INTERRUPT AND

7    PROVIDE YOU WITH THAT CASE?

8           THE COURT:  WHY DON'T YOU DO THAT.  DO YOU HAVE A

9    COPY OF IT?

10          MR. LOVELL:  IT'S ON MY COMPUTER, JUDGE, THE CITE IS.

11          MR. MACKUSICK:  I WASN'T GOING TO MENTION IT.  IT

12   DIDN'T SOUND LIKE --

13          THE COURT:  WHAT I WAS GOING TO SUGGEST IS THIS.  I

14   KNOW THIS IS AN ISSUE THAT AFFECTS SEVERAL DEFENDANTS AND MAYBE

15   WHAT YOU COULD DO IS GIVE ME THE CASE, AT LEAST THE CITE, AND I

16   CAN LOOK AT IT OVER THE LUNCH BREAK.

17          MR. LOVELL:  YES, JUDGE, WHAT I HAVE IS U.S. V

18   OLIVIER.  IT'S 270 --

19          THE COURT:  WAIT A MINUTE.

20          MR. LOVELL:  IT'S A NONREPORTED 2008 CASE BUT IT

21   CITES WITHIN IT AN ELEVENTH CIRCUIT 95 REPORTED CASE.

22          THE COURT:  STATE THE CITE AGAIN.

23          MR. LOVELL:  THE 2008 CASE IS 270 FED APPX 950 AND IT

24   CITES TO COINCIDENTALLY UNITED STATES V. HALL AND THAT'S AT 46

25   F.3D 62, AND IT STANDS FOR THE PROPOSITION THAT THE GOVERNMENT

1 HAS THE BURDEN UNDER 2D1.1(B)(1) TO DEMONSTRATE THE PROXIMITY

2 OF THE FIREARM TO THE SITE OF THE CHARGED OFFENSE BY A

3 PREPONDERANCE OF THE EVIDENCE.

4      SO THEY HAVE THE BURDEN OF COMING FORWARD AND SHOWING

5 BY A PREPONDERANCE OF THE EVIDENCE THAT A FIREARM IS LINKED TO

6 THE SITE, AND I THINK THEN THE NEXT STEP IS TO LINK THE

7 DEFENDANT TO THAT SITE, TOO, NOT JUST BY CONJECTURE,

8 SPECULATION OR GUESSWORK BUT THERE HAS TO BE SOME EVIDENCE, AND

9 PREPONDERANCE OF THE EVIDENCE IS IN FACT THE BURDEN.

10      THE COURT:  NOBODY HAS A COPY OF U.S. VERSUS OLIVER?

11      MR. MACKUSICK:  NO, YOUR HONOR.

12      MR. LOVELL:  IT'S O L I V I E R.

13      THE COURT:  THIS IS AN UNPUBLISHED OPINION?

14      MR. LOVELL:  OLIVIER IS UNPUBLISHED.  HALL IS

15 PUBLISHED.  OLIVIER IS THIS YEAR, SO IT'S JUST DEMONSTRATING

16 THAT THAT 1995 LAW IS STILL VERY MUCH --

17      THE COURT:  AND THE HALL CASE IS WHAT CITE?

18      MR. LOVELL:  46 F.3D 62 AT PAGE 63.

19      THE COURT:  OUR COMPUTERS ARE DOWN TODAY.  IF ANYBODY

20 CAN GET ME A COPY OF THAT OLIVIER CASE I SURE WOULD LIKE TO SEE

21 IT.

22      MR. MCBURNEY:  I THINK IT'S EASIER FOR US.  WHETHER

23 IT'S A GOOD CASE OR NOT, WE'LL PRINT IT OUT AND GET A COPY FOR

24 MR. MACKUSICK AND THE COURT AT SOME POINT DURING LUNCH.

25      MR. LOVELL:  AND YOU MAY WANT THE HALL CASE ALSO.

1          THE COURT:  IS THAT PUBLISHED?

2          MR. LOVELL:  IT IS PUBLISHED.

3          THE COURT:  I CAN GET THAT.  LET'S TAKE A LUNCH BREAK

4    UNTIL TWO O'CLOCK.

5          (NOON RECESS)

6          THE COURT:  DURING THE LUNCH BREAK I LOOKED AT A

7    NUMBER OF CASES THAT YOU ALL HAD SUPPLIED TO ME, THE OLIVIER

8    CASE, THE HOLLANDER AND THE PHAM CASES WHICH WERE DROPPED OFF

9    AT MY OFFICE BY THE GOVERNMENT AND I ASSUME YOU'VE LOOKED AT

10   THEM.

11         MR. MACKUSICK:  I DID, YOUR HONOR.  THANK YOU.

12         THE COURT:  THE HALL CASE AND ALSO THE CLAY CASE, AND

13   I'M PRETTY SURE I REMEMBER NOW THE CASE I GOT REVERSED ON WAS A

14   924(C) CASE.  SO THAT DOESN'T REALLY COUNT.

15         THE CASES THAT I'VE LOOKED AT DON'T CHANGE MY MIND

16   ABOUT WHAT I SAID BEFORE THE LUNCH BREAK.  WHAT THOSE CASES ARE

17   ABOUT AND WHAT THAT GUIDELINE IS ABOUT IS IF YOU DETERMINE THAT

18   A COCONSPIRATOR POSSESSES A WEAPON IN CONNECTION WITH A DRUG

19   CASE CAN THAT COCONSPIRATOR'S POSSESSION BE ATTRIBUTED TO THE

20   DEFENDANT AND THE TEST FOR THAT IS ONE OF FORESEEABILITY.

21         THE PROBLEM I'M HAVING HERE IS THAT THE PREDICATE

22   EVIDENCE IS NOT BEFORE ME.  THE PREDICATE EVIDENCE IN ALL OF

23   THOSE CASES IS THAT THERE WAS EVIDENCE THAT A COCONSPIRATOR

24   POSSESSED A WEAPON, AND THE ISSUE WAS COULD IT BE ATTRIBUTED TO

25   THE DEFENDANT.

1          IN THIS CASE THAT I'M LOOKING AT RIGHT NOW THE

2    MCKNIGHT CASE, I DON'T SEE ANYTHING IN THE PRESENTENCE REPORT

3    THAT SAYS THAT A COCONSPIRATOR POSSESSED A WEAPON AT A LOCATION

4    WHERE MR. MCKNIGHT WAS.

5          THE PRESENTENCE REPORT INDICATES THAT HE PRIMARILY

6    HUNG OUT AT A LOCATION CALLED THE GATE, AND I DON'T SEE

7    ANYTHING IN THE PRESENTENCE REPORT THAT SAYS THAT SOMEBODY

8    WORKING AT THE GATE POSSESSED A WEAPON.  SEE THAT'S THE PROBLEM

9    HERE.

10          WE'RE SKIPPING OVER THE INITIAL STEP THAT SOMEBODY AT

11    THE RELEVANT LOCATION HAD A WEAPON.  INSTEAD OF THAT WHAT THE

12    PRESENTENCE REPORT IS INDICATING IS THAT THE WEAPON SHOULD BE

13    ATTRIBUTED TO MR. MCKNIGHT OR A WEAPON SHOULD BE ATTRIBUTED TO

14    HIM BECAUSE IT'S COMMONSENSICAL THAT PEOPLE WHO WORK AT STASH

15    HOUSES AND THE GATE WAS A STASH HOUSE POSSESSED WEAPONS, AND I

16    AGREE WITH THAT.  I MEAN THAT IS COMMONSENSICAL TO ME.

17          BUT THE GUIDELINES ARE TECHNICAL AND UNLESS THE

18    GOVERNMENT HAS SOME EVIDENCE THAT SOMEBODY AT A LOCATION THAT

19    IS WHERE MR. MCKNIGHT WAS HAD A WEAPON, THEN WE'RE MISSING THAT

20    FIRST STEP.  MAYBE THE EVIDENCE IS OUT THERE SOMEWHERE BUT I

21    DON'T SEE IT IN THE PRESENTENCE REPORT.

22          MR. MCBURNEY:  I'LL TELL YOU WHAT WE HAVE.  THE

23    ANSWER IS NO, WE DON'T HAVE THAT SPECIFICALLY, BUT IN LIGHT OF

24    THE PHAM CASE AND THE HOLLANDER CASE AND THIS REASONABLE

25    FORESEEABILITY, WHAT WE DO HAVE -- I'M JUST REPEATING MYSELF

1  NOW -- IS ALL THE STASH HOUSES THAT WERE SEARCHED, THE ONE TIME

2  THEY DID GET A LOAD VEHICLE THAT HAD A LOAD IN IT, GUNS WERE

3  FOUND.  SO WHAT THE RESULT WILL BE -- I UNDERSTAND WHAT THE

4  COURT IS SAYING.  THE RESULT WILL BE IF --

5      THE COURT:  DO YOU MEAN A LOAD VEHICLE AT THE GATE?

6      MR. MCBURNEY:  NO BUT AT THE STASH HOUSE TO WHICH THE

7  OPERATIONS MOVED AFTER THEY STOPPED WORKING AT THE GATE.  MR.

8  MCKNIGHT IS MOST DIRECTLY CONNECTED WITH WHAT WE'LL CALL THE

9  GATE AND THIS HOUSE IN TEXAS.  I DON'T HAVE ANYONE WHO CAN SAY

10 THERE WAS A GUN THERE.

11     WE HAVE GUNS SEIZED FROM A LOAD VEHICLE THAT WAS AT

12 SPACE MOUNTAIN, BUGSY SIEGEL, THAT'S THE SAME LOCATION, NOT THE

13 GATE.  WE HAVE GUNS SEIZED FROM THAT LOCATION.  WE HAVE GUNS

14 SEIZED FROM THE WHITE HOUSE WHICH WAS ANOTHER STASH LOCATION,

15 BUT WE DON'T HAVE FOR THAT ONE LOCATION THE GATE BECAUSE THERE

16 WASN'T A WARRANT EXECUTED THEN GUNS.

17     SO WHAT YOU'D BE FINDING IS THERE WERE GUNS IN ALL

18 THESE OTHER PLACES BUT BECAUSE YOU DIDN'T FIND ANY HERE BUT

19 THERE IS EVIDENCE, UNCONTESTED EVIDENCE THAT THE DEFENDANT AND

20 MANY OTHERS LOADED AND UNLOADED DRUGS AND SUBSTANTIAL SUMS OF

21 MONEY AT THE GATE, BUT THERE WEREN'T ANY GUNS THERE.

22     THE COURT IS NOT GOING TO FIND THAT THEY WERE THERE.

23 THEY WERE EVERYWHERE ELSE BUT THERE WAS SOMETHING SPECIAL ABOUT

24 THE GATE, NO GUNS WERE THERE.  THE THING THAT'S SPECIAL ABOUT

25 IT IS WE DON'T HAVE A WITNESS TO DO WHAT YOU THINK SHOULD BE

1   DONE.

2          AND IF THAT'S THE CONCLUSION, THEN I THINK MCKNIGHT

3   DOESN'T QUALIFY FOR AN ENHANCEMENT BUT HALL WILL BECAUSE HALL

4   WAS ACTIVE AT SPACE MOUNTAIN, AND MR. HAMMONDS WHO WE'LL GET TO

5   LATER WILL BECAUSE HE WAS ACTIVE AT THE WHITE HOUSE, AND WE

6   HAVE GUNS SEIZED IN BOTH THOSE LOCATIONS.

7          I THINK IT SHOULD APPLY TO ALL THREE OF THEM, BUT I

8   UNDERSTAND THE COURT'S REASONING, AND THERE ISN'T A WAY FOR ME

9   TO GET YOU A GUN AT THE GATE.

10         THE COURT:  ALL RIGHT.  I'LL SUSTAIN THE OBJECTION.

11  NOW WHERE DOES THAT LEAVE US IN TERMS OF THE GUIDELINES?

12         MR. MACKUSICK:  I THINK LEVEL 27.

13         THE COURT:  WHAT DOES THAT MEAN IN TERMS OF MONTHS?

14         MR. MACKUSICK:  70 TO 87 MONTHS.  HE'S A CRIMINAL

15  CATEGORY 1.

16         THE COURT:  DOES ANYBODY DISAGREE WITH THAT?

17         MR. MCBURNEY:  NOT GIVEN YOUR FINDINGS.

18         THE COURT:  OKAY.  ALL RIGHT.  NOW, WHAT ABOUT THE

19  ISSUE OF MINOR ROLE?  DID YOU -- I CAN'T RECALL.  YOU MAY HAVE

20  ADDRESSED THIS.  DID YOU WANT TO BE HEARD ON THAT?

21         MR. MCBURNEY:  NO, I THINK FOR MR. MCKNIGHT IT'S A

22  CLOSE CALL.  I WANT TO SAVE MY AMMUNITION ON MINOR ROLE FOR A

23  DIFFERENT DEFENDANT WHERE I DON'T THINK IT'S AS CLOSE A CALL

24  BUT PROBATION MAY NOT BE SEEING IT THE SAME WAY I DO.

25         THE COURT:  NOW GIVEN THOSE RULINGS WHAT WOULD A

1  REASONABLE SENTENCE BE FOR MR. MCKNIGHT.

2         MR. MACKUSICK:  I HATE THAT QUESTION, YOUR HONOR, BUT

3  I'M HAPPY TO TRY TO ADDRESS IT.  BEFORE I DO HIS MOTHER IS HERE

4  ALONG WITH HIS SISTER, AND SOME OTHER PEOPLE.  HIS MOTHER MARY

5  COLES IS HERE TO SUPPORT MR. MCKNIGHT, HIS SISTER MS. BOLER, A

6  FRIEND OF HIS RONNIE HEINRICK AND A FRIEND OF MS. COLES IS

7  HERE.

8         MS. COLES WANTED TO ADDRESS THE COURT FOR A MINUTE.

9         THE COURT:  ALL RIGHT.

10        MR. MACKUSICK:  I THINK SHE'S GOING TO COME UP WITH

11  MS. BOLER BUT MS. BOLER IS HERE FOR MORAL SUPPORT, AND THEN I

12  WILL ATTEMPT TO ANSWER YOUR QUESTION AS BEST I CAN.

13        THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

14        MS. COLES:  GOOD AFTERNOON, YOUR HONOR.  THANK YOU SO

15  MUCH FOR RECEIVING MY DAUGHTER AND MYSELF FROM CALIFORNIA THIS

16  AFTERNOON IN SUPPORT OF MY SON BARIMA MCKNIGHT AND FOR OUR

17  FAMILY AND MY THREE GRANDSONS BARIMA BOYCE, ELIJAH TWELVE SOON

18  TO BE THIRTEEN IN DECEMBER, CHRISTIAN EIGHT YEARS OLD AND MY

19  BABY GRANDSON BRANDON WHO IS FOUR.

20        I'D JUST LIKE TO SAY MY SON'S OBJECTIVE SINCE HE WAS

21  A LITTLE BOY HAS BEEN TO BE AN ENTERTAINER.  HE DID HIS FIRST

22  JOHNSON & JOHNSON BABY SHAMPOO COMMERCIAL AT 15 MONTHS OLD.

23  HE'S APPEARED IN SEVERAL, NOT APPEARED BUT HAD ROLES IN SEVERAL

24  MOTION PICTURES.  HE'S WON AWARDS FOR HIS MUSIC.  HE HAS -- I

25  HAVE A LITTLE NOTE SO I'LL PEEK DOWN TO REMEMBER ALL OF THIS.

1    HE'S DONE MANY RADIO INTERVIEWS.  HE'S A MEMBER OF

2    THE SCREEN ACTORS GUILD, ASCAP, SCREEN ACTORS GUILD FOR AT

3    LEAST THE LAST 12 AREAS SINCE 1998, AND I AM BLESSED WITH THE

4    FOUR GRANDSONS THAT I HAVE.  THEY ADMIRE THEIR DAD.  THEY LOOK

5    UP TO HIM.  THEY LOVE HIM.

6    WHEN THEY SEE HIM ON THE SCREEN AND SEE HIM PERFORM,

7    THEY ARE ABSOLUTELY OVERJOYED AND IT GIVES ME JOY TO SEE THEM

8    JOYED ABOUT THEIR FATHER.  MY ENTIRE FAMILY INCLUDING MY MOM,

9    MY DAUGHTER, HER HUSBAND AND NIECES AND NEPHEWS WHICH I HAVE

10   ONE NIECE AND ONE NEPHEW AND THREE GRANDSONS, OUR ENTIRE HAS

11   BEEN PROUD OF BARIMA'S CAREER UP UNTIL NOW.

12   I'M NOT MAKING ANY EXCUSES FOR MY SON TODAY BECAUSE I

13   KNOW THAT HE HAS TO BE RESPONSIBLE FOR THE CHOICES THAT HE

14   MAKES, BUT MY SON IS A KIND, REALLY A LOVING PERSON.  HE'S A

15   GIVER, AND BARIMA BECAUSE OF HIS TRUST AND HIS FRIENDSHIP AND

16   HIS EASYGOINGNESS I THINK LANDED HIM IN THIS POSITION TODAY.

17   HE'S ALWAYS RESPECTED ME AS HIS MOM AND HIS SONS NEED

18   HIM AS A FATHER.  I WAS A SINGLE PARENT RAISING THESE TWO, AND

19   I DID A FINE JOB I THOUGHT UP UNTIL THIS POINT IN TIME MY SON'S

20   LIFE, BUT TODAY ME AND MY FAMILY WE PRAY THAT YOU WOULD FIND

21   MERCY AND GRACE UPON MY SON AND THAT YOU WOULD BE LENIENT IN

22   YOUR SENTENCE OF HIM TODAY, AND I'D LIKE TO SEE HIM BACK WITH

23   MY GRANDSONS SO VERY MUCH.  THANK YOU SO MUCH FOR YOUR TIME.

24   THE COURT:  THANK YOU, MS. COLES.

25   MS. COLES:  YOU'RE WELCOME.

1          MR. MACKUSICK:  YOUR HONOR, I FORGOT TO MENTION MS.

2   COLES CAME ALL THE WAY HERE FROM CALIFORNIA TO BE HERE TODAY

3   ALONG WITH MS. BOLER.

4          A REASONABLE SENTENCE, THE GUIDELINE RANGE IS 70 TO

5   87 MONTHS.  OUR POSITION ON A REASONABLE SENTENCE WOULD BE A

6   SENTENCE BETWEEN 48 AND 60 MONTHS.  I'M GOING TO PICK THE

7   MIDDLE 56 MONTHS AND I'LL TELL YOU WHY.

8          PART OF IT IS A PROPORTIONALITY ARGUMENT.  I DON'T

9   HAVE THE BENEFIT OF EVERYBODY ELSE BEING SENTENCED IN THIS

10  CASE.  I SAW SOME OF THE EARLIER ONES.  IT APPEARS TO ME THAT

11  THE DEFENDANTS BREAK UP IN THREE GROUPS.

12         THERE'S THE GUYS AT THE TOP OF THE HEAP.  THEY'RE

13  GETTING SENTENCES IN THE 120 ON UP RANGE, TEN YEARS AND

14  LONGER.  THERE ARE SOME PEOPLE WHO ARE PLAINLY LESS CULPABLE.

15  I DON'T KNOW THAT WE'VE SEEN ONE OF THOSE YET.  POSSIBLY MR.

16  FIELDS I NOTICED YOU GAVE HIM 70 MONTHS BUT HE DID HAVE SOME

17  CRIMINAL HISTORY.

18         THERE WERE SOME PEOPLE SENTENCED IN MICHIGAN.  I

19  DON'T HAVE THE BENEFIT OF THEIR PRESENTENCE REPORT.  SO I DON'T

20  KNOW HOW THEY GOT WHAT THEY GOT, BUT LOOKING AT THOSE IT LOOKS

21  LIKE THEY FELL INTO THOSE THREE CATEGORIES AS WELL.  A FAIR

22  NUMBER OF LEADERS OVER 120 MONTHS UP TO 360.  A LUMP OF GUYS

23  KIND OF IN THE MIDDLE THEY SEEM TO BE IN THE LOW 40'S, 48 TO

24  60, 70 IN THERE.

25         THEN THERE WERE SOME OTHER PEOPLE WAY DOWN AT THE

1    BOTTOM.  THERE WAS SOME PROBATION AND 24 MONTHS OR WHATNOT.  I

2    SUSPECT THOSE WERE THE MOST MINORLY INVOLVED PEOPLE.  I'M NOT

3    SAYING HE'S ONE OF THOSE, BUT I THINK HE FALLS IN THAT MIDDLE

4    CLUMP OF FOLKS.  HE'S A LOADER/UNLOADER OF CARS, COUNTER OF

5    MONEY, THAT SORT OF THING.

6            I KNOW THE GOVERNMENT HAD THAT TABLE THAT HAD THE TWO

7    VECTORS AND IT WAS REALLY INTERESTING AND ALL, BUT IT SEEMED TO

8    ME THAT THEY OVERSTATE A LITTLE BIT HIS CULPABILITY ON THAT

9    TABLE, AND I KNOW THE GOVERNMENT IN ITS MEMO SAID HE'S IN THE

10   INNER HIERARCHY AND THAT'S TRUE HE IS IN THE INNER HIERARCHY OF

11   BMF IN TERMS OF HE HAD MORE DIRECT ACCESS TO DEMETRIUS FLENORY.

12           BUT MOST OF THAT PART, HIS CLOSENESS TO MR. FLENORY

13   HAD TO DO WITH THE ENTERTAINMENT INDUSTRY.  AS FAR AS THE DRUGS

14   WENT, MR. FLENORY ACTUALLY WANTED HIM TO STAY AWAY FROM THE

15   DRUGS, AND IN FACT AT SOME POINT IN 2003 ORDERED HIM TO STAY

16   AWAY FROM THE DRUGS, YOU'RE SUPPOSED TO DO THE ENTERTAINMENT

17   ONLY.

18           SO WITH THE DRUG PART OF BMF, AND I SAY THE DRUG PART

19   BECAUSE THERE IS TWO PARTS.  THERE'S THE DRUG CONSPIRACY AND

20   THEN THERE'S BMF ENTERTAINMENT.  AS FAR AS THE DRUG PART WENT

21   HE'S JUST A LOADER/UNLOADER.  HE'S LIKE ALL THOSE GUYS IN THE

22   MIDDLE.

23           OBVIOUSLY HE GOT A MINOR ROLE.  HE DOESN'T DIRECT

24   ANYONE.  HE DOESN'T MAKE ANY DECISIONS.  HE DOESN'T DO ANYTHING

25   REALLY OTHER THAN LOAD, UNLOAD DRUGS, COUNT MONEY AND THAT SORT

1    OF THING.

2         TRUE HE'S CLOSE TO DEMETRIUS FLENORY BUT THAT'S

3    BECAUSE HE'S AN ENTERTAINER, AND SO DEMETRIUS LETS HIM HANG

4    AROUND, THEY GO TO CLUBS, THEY DO THAT SORT OF STUFF TOGETHER,

5    BUT THAT'S APART FROM THE DRUG ACTIVITY.  SO IT SEEMS TO ME HE

6    SHOULD BE IN THAT MIDDLE GROUP IN THAT RANGE THERE.

7         OTHER THINGS I WANTED TO POINT OUT.  WE'VE ALL

8    MENTIONED HE'S AN ENTERTAINER.  ACTUALLY MR. MCBURNEY BEFORE

9    THE BREAK COVERED THAT PROBABLY BETTER THAN I CAN, BUT THAT'S

10   HOW HE GOT IN THIS MESS.  HE'S PROBABLY GOING TO TELL YOU THAT

11   HIMSELF.

12        THE COURT:  LET ME ASK YOU THIS.  FOR WHAT PERIOD OF

13   TIME WAS MR. MCKNIGHT LOADING AND UNLOADING THE COCAINE?

14        MR. MACKUSICK:  WE BELIEVE FROM -- I'M NOT EXACTLY

15   SURE WHEN IT BEGINS, MAYBE 99 THROUGH 2003.  I COULD BE WRONG

16   ESPECIALLY ABOUT THE BEGINNING.

17        MR. MCBURNEY:  02 TO 04.

18        THE COURT:  I'M SORRY, YOU'RE SAYING IT STARTED IN

19   99; ARE YOU SAYING THAT OR NOT?

20        MR. MACKUSICK:  NO, NO, WE'RE THINKING 2002 TO 2004.

21        THE COURT:  2002 TO 2004.

22        MR. MACKUSICK:  AND AFTER THAT HE STILL HUNG AROUND

23   WITH THESE PEOPLE TO SOME EXTENT BUT WAS SEPARATED FROM THE

24   DRUGS.  DEMETRIUS FLENORY WANTED HIM AWAY FROM THE DRUGS,

25   WANTED HIM TO FOCUS ON ENTERTAINMENT ACTIVITIES.

1          OTHER THAN THAT I THINK I'LL LET HIM ADDRESS YOU

2   HIMSELF.

3          THE COURT:  SO YOU'RE ASKING FOR A 56 MONTH

4   SENTENCE?

5          MR. MACKUSICK:  I THINK THAT'S A REASONABLE SENTENCE,

6   YES, MA'AM.

7          THE COURT:  DOES THE GOVERNMENT HAVE A RECOMMENDATION

8   CONSISTENT WITH THE PLEA AGREEMENT?

9          MR. MCBURNEY:  YES, JUDGE, 72 MONTHS WHICH IS TWO

10   MONTHS ABOVE THE LOW END OF THE RANGE WE NOW FIND OURSELVES

11   IN.  IT'S A SIX YEAR TERM.

12          I WOULD DISTINGUISH FROM MR. MCKNIGHT FROM MR. FIELDS

13   WHO IS THE CLOSEST IN TERMS OF THE SIZE OF THE SENTENCE IN A

14   VARIETY OF WAYS.

15          MR. FIELDS AT MOST HAD THIS ONE DELIVERY UP TO

16   TENNESSEE AND THEN HANDED A BAG ONCE BY BILL MARSHALL.  THAT'S

17   A DIFFERENT REALM ALL TOGETHER.

18          MR. MCKNIGHT WHILE HE DIDN'T DO THIS FULL TIME FOR

19   THE BLACK MAFIA FAMILY IS SOMEONE WHO WAS TOUCHING HUNDREDS OF

20   KILOS COCAINE, NOT AT ONCE BUT OVER TIME, AND MILLIONS OF

21   DOLLARS.  SO HE WAS IN THE THICK OF IT INTERMITTENTLY.

22          I DON'T CONTEST THIS NOTION THAT HIS PRIMARY

23   CONNECTION WITH BMF AND DEMETRIUS FLENORY, MEECH, WAS MUSIC.

24   THAT'S HOW HE GOT INVOLVED WITH THESE GUYS TO BEGIN WITH, BUT

25   AT SOME POINT HIS EYES WERE OPENED TO HOW THEY REALLY MADE

1 THEIR MONEY.  SO I THINK IT IS IMPORTANT NOT TO DIVORCE THE TWO

2 ENTIRELY.

3          I SUSPECT THAT MR. MCKNIGHT WILL GET UP HERE IN A

4 MINUTE TO TELL YOU HOW HE HARD HE WORKED TO FURTHER HIS MUSICAL

5 CAREER, BUT IT IS UNDISPUTED THAT SOME OF THE PROPULSION BEHIND

6 HIS SUCCESS WAS DRUG MONEY.  MONEY THAT THE BMF MADE FROM

7 SELLING ITS DRUGS.

8          AND PEOPLE HAVE BEEN VERY CANDID THAT THERE WAS AN

9 EFFORT TO CREATE A LEGITIMATE FRONT FOR BMF SO THAT IT COULD BE

10 BMF ENTERTAINMENT, NO, NO, WE'RE A MUSIC PRODUCING BUSINESS AND

11 THAT'S WHY WE HAVE THE MONEY AND THE FANCY CARS AND THE LADIES

12 AND WE CAN THROW A BIRTHDAY PARTY FOR MEECH WITH LIONS AND

13 TIGERS COSTING HUNDREDS OF THOUSANDS OF DOLLARS BECAUSE WE'RE

14 IN THE MUSIC PROMOTION AND HERE'S OUR FIGUREHEAD, THIS IS OUR

15 PERFORMER AND HE HAS ALBUMS, AND WE'RE NOT DISPUTING THAT BUT

16 THAT'S PART OF THIS BMF GIG.

17          SO I THINK THAT HE WAS MORE INVOLVED.  HE'S CERTAINLY

18 IN THE INNER CIRCLE, AND AGAIN PART OF HIS CONNECTION TO THE

19 INNER CIRCLE WAS MUSIC BUT IT WAS ALSO DRUGS, AND THAT'S WHY WE

20 THINK A GUIDELINE SENTENCE GIVEN THE MINOR ROLE THAT THE COURT

21 IS FINDING, AND I THINK IT'S A CLOSE CALL BUT I'M NOT

22 CONTESTING THAT, AND I OBVIOUSLY CONTESTED THE FIREARM

23 ENHANCEMENT AND THE COURT HAS SUSTAINED THE OBJECTION.

24          I THINK THE RANGE THAT WE'RE AT NOW IS A VERY

25 REASONABLE RANGE GIVEN MR. MCKNIGHT'S CONNECTION TO THE DRUG

1  ENTERPRISE.

2          THE COURT:  MR. MCKNIGHT, COME ON UP AND STAND BEHIND

3  THE PODIUM, IF YOU WOULD.

4          MR. MACKUSICK:  AS HE'S COMING UP, YOUR HONOR, I DID

5  LEAVE ONE THING OUT.  YOU HAD ASKED SOME OF THE OTHER

6  DEFENDANTS WHETHER OR NOT THEY HAD COOPERATED.  MR. MCKNIGHT

7  WAS ONE OF THE INDIVIDUALS WHO DID ATTEMPT TO COOPERATE.  HE

8  WAS DEBRIEFED BY THE GOVERNMENT, BUT BASICALLY HE DIDN'T KNOW

9  ANYTHING THAT WAS USEFUL AGAINST THE REMAINING DEFENDANTS.

10          SO THAT HAPPENED BEFORE LAST WEEK.  IT WAS MONTHS AGO

11  THAT DEBRIEFING, AND THEN WE DID THE SAFETY VALVE ONE EARLIER

12  THIS WEEK.  HE WOULD HAVE LIKED TO COOPERATE IF HE COULD, BUT

13  UNFORTUNATELY HE DID NOT REALLY HAVE ANY USEFUL INFORMATION.

14          THE COURT:  WOULD YOU LIKE TO MAKE A STATEMENT?

15          THE DEFENDANT:  YES, MA'AM.  FIRST I WANT TO

16  APOLOGIZE TO THE COURT, TO YOU.  SECONDLY, MY FAMILY IN THE

17  BACK, YOU KNOW, I JUST -- I TRIED HARD MY WHOLE LIFE TO MAKE

18  SOMETHING OF MYSELF.  MY MOM IS AN AERO OPTICAL ENGINEER.  SHE

19  MAKES NIGHT VISION FOR FIGHTER JETS.  SO TO COMPARE TO THAT WAS

20  HARD.

21          IT WAS REAL HARD FOR ME.  I WASN'T TRYING TO COMPARE

22  MYSELF TO MY MOM BUT ENTERTAINING IS SOMETHING THAT I ALWAYS

23  LOVED.  I JUST KIND OF GOT ON THE WRONG SIDE OF THE TRACK WITH

24  A COUPLE OF WRONG PEOPLE.  I HADN'T REALLY GOT IN TROUBLE SINCE

25  I WAS 16 YEARS OLD.  I'M 30 YEARS OLD NOW.

1          I'VE KEPT MY LIFE ON A STRAIGHT AND NARROW PATH SINCE

2     I WAS 16 YEARS OLD, AND THEN, YOU KNOW, I JUST KIND OF GOT ON

3     THE WRONG TRACK, JUDGE.  YOU'VE GOT TO EXCUSE ME.  MY SISTER,

4     SHE'S LIKE ANOTHER MOM TO ME.  SHE HELPED RAISE ME.  I DIDN'T

5     EXPECT HER TO BE HERE.  SHE TOLD ME SHE COULDN'T GET OFF WORK

6     AND SHE SURPRISED ME.  SO THAT'S REAL EMOTIONAL FOR ME.

7          I HAVE THREE BOYS ASKING ME WHEN AM I COMING HOME

8     EVERYTIME I TALK TO THEM, AND IT'S NOT HARD TO BE ABLE TO

9     ANSWER THOSE GUYS.  THEY REALLY LOOK UP TO ME AND THEY NEED

10    ME.

11         I KNOW MY MOM AND MY SISTER PROBABLY HAVEN'T SEEN ME

12    GET THIS EMOTIONAL IN YEARS, BUT I JUST CAN'T HELP IT.  I ASK

13    GOD FOR FORGIVENESS.  I'M ASKING THE COURTS, YOU KNOW, THIS

14    YEAR I'VE BEEN IN JAIL FOR A YEAR.  IT'S BEEN A REAL HARD YEAR

15    FOR ME.

16         I'VE WATCHED SOMEONE TAKE THEIR LIFE IN FRONT OF ME

17    IN JAIL, YOU KNOW, JUST BY NOT BEING ABLE TO HANDLE THE

18    PRESSURE.  I WAS ACTUALLY THE GUY TO TAKE THE NOOSE OF THIS

19    GUY'S NECK BECAUSE EVERYONE WAS SCARED TO DO IT.  SO IT'S JUST

20    BEEN REAL HARD FOR ME, JUDGE.  I'M JUST ASKING, YOU KNOW, JUST

21    FOR THE COURT'S LENIENCY ON ME AS MUCH AS POSSIBLE.

22         I KNOW I HAVE TO TAKE CARE OF MY RESPONSIBILITY.  I

23    HAVE TO OWN UP TO MY ACTIONS AND THAT'S WHAT I'M HERE TO DO

24    TODAY, JUDGE.  IT'S NOT REALLY A LOT I HAVE TO SAY.  80,000

25    SORRIES JUST WON'T WORK.  I UNDERSTAND THAT, AND I AM A MAN AND

1  I AM WILLING TO TAKE CARE OF MY RESPONSIBILITIES AND I'M

2  WILLING TO PAY THE PRICE FOR MY ACTIONS BUT THOSE WERE NEVER MY

3  INTENTIONS, AND I JUST WANTED THE COURT TO KNOW THAT.  OKAY.

4        THIS IS A NOTE TO REMIND ME.  THIS IS ABOUT THINGS

5  THAT I'VE DONE.  I'VE WORKED WITH PARAMOUNT PICTURES.  I'VE

6  COSTARED IN A MOVIE.  I WAS ACTUALLY IN A LEPRECHAUN MOVIE.  I

7  DON'T KNOW IF THE COURT IS FAMILIAR WITH THE LITTLE LEPRECHAUN

8  WARWICK DAVIS, BUT I DID A STUNT IN THE MOVIE.  I WAS KILLED BY

9  THE LEPRECHAUNS.

10        I'VE WORKED DEF JAM RECORDS, PRIORITY RECORDS, YOU

11  KNOW, AND TO ME BMF ENTERTAINMENT, WHEN I MET THOSE PEOPLE I

12  DIDN'T LOOK AT THEM AS A BIG DRUG RING.  DEMETRIUS DID NOT SHOW

13  ME THAT PART OF HIS WORLD WHEN I MET HIM, AND I GOT INTO LIKE A

14  BIG BROTHER/LITTLE BROTHER RELATIONSHIP WITH THIS GUY AS FAR AS

15  ENTERTAINMENT IS CONCERNED.

16        I MET HIM IN THE END OF 98.  99, 2000, 2001 I CAME TO

17  KNOW THIS MAN WITHOUT EVEN KNOWING THE OTHER SIDE OF HIS LIFE.

18  2002 I DID GET IN ABOVE MY HEAD, YOU KNOW, THE END OF 2003,

19  2004 HE, LIKE THEY SAID, HE ORDERED ME TO STAY AWAY FROM

20  ANYTHING ILLEGAL THAT THEY WERE DOING AND THAT'S WHAT I DID.

21  SO EVER SINCE 2004 I'VE JUST BEEN PURSUING MY CAREER.  I

22  ACTUALLY RELEASED BY FIRST DEBUT RECORD ON KOCH RECORDS IN

23  2006, AND THOSE ARE BASICALLY MY ACCOMPLISHMENTS.

24        THE COURT:  OKAY.  MR. MCKNIGHT, THE SENTENCE OF THE

25  COURT IS AS FOLLOWS:  YOU'RE COMMITTED TO THE CUSTODY OF THE

1  BUREAU OF PRISONS FOR A TERM OF 64 MONTHS.  YOU'RE ORDERED TO

2  PAY THE UNITED STATES A SPECIAL ASSESSMENT OF A HUNDRED DOLLARS

3  WHICH IS DUE IMMEDIATELY.  NO FINE WILL BE IMPOSED.

4          WHEN YOU GET OUT OF PRISON, YOU'LL BE ON SUPERVISED

5  RELEASE FOR A TERM OF FIVE YEARS.  THE STANDARD CONDITIONS OF

6  SUPERVISED RELEASE WILL APPLY.

7          IN ADDITION TO THAT YOU SHALL PARTICIPATE IN A

8  DRUG/ALCOHOL TREATMENT PROGRAM UNDER THE GUIDANCE AND

9  SUPERVISION OF YOUR PROBATION OFFICER.  YOU SHALL SUBMIT TO

10 DRUG TESTING IF DIRECTED TO DO SO BY YOUR PROBATION OFFICER.

11 YOU SHALL NOT ILLEGALLY POSSESS A CONTROLLED SUBSTANCE.  YOU

12 SHALL PARTICIPATE IN DNA TESTING IF DIRECTED TO DO SO BY YOUR

13 PROBATION OFFICER.

14         YOU SHALL NOT OWN, POSSESS OR HAVE UNDER YOUR CONTROL

15 ANY FIREARM, DANGEROUS WEAPON OR OTHER DESTRUCTIVE DEVICE.  YOU

16 SHALL SUBMIT TO A SEARCH OF YOUR PERSON, PROPERTY, RESIDENCE OR

17 VEHICLE IF DIRECTED TO DO SO BY YOUR PROBATION OFFICER.

18         ANY EXCEPTIONS?

19         MR. MACKUSICK:  NO, YOUR HONOR.

20         THE COURT:  ANYTHING IN PARTICULAR YOU WANT ME TO ADD

21 TO THE J&C.

22         MR. MACKUSICK:  YES, YOUR HONOR.  WE'D LIKE TO ASK

23 YOU TO CONSIDER RECOMMENDING THE DRUG PROGRAM.  HE DID ADMIT

24 AND IT IS NOTED IN THE PRESENTENCE REPORT THAT HE IS A DAILY

25 USER OF MARIJUANA OR WAS UP UNTIL HE WAS INCARCERATED, AND THE

1   OTHER WOULD SIMPLY BE A RECOMMENDATION THAT HE BE HOUSED IN THE

2   APPROPRIATE SECURITY LEVEL FACILITY CLOSEST TO ATLANTA.

3            THE COURT:  ALL RIGHT.  ANY EXCEPTIONS BY THE

4   GOVERNMENT?

5            MR. MCBURNEY:  WE MAINTAIN OUR OPPOSITION TO THE

6   RULING ON THE GUN ENHANCEMENT.  THAT'S ALL.

7            THE COURT:  OKAY.

8            THE COURT:  ANY OBJECTION TO THE DRUG TREATMENT

9   PROGRAM?

10           MR. MCBURNEY:  IT'S NOT MY AREA OF EXPERTISE.  MY

11  UNDERSTANDING IS THAT MR. MCKNIGHT IS A RECREATIONAL DRUG USER,

12  SMOKE A JOINT, LIKELY DRINK A BEER AS OPPOSED TO AN ADDICT.

13  THAT TO ME ISN'T WHAT THE PROGRAM IS ALL ABOUT, BUT THAT'S FOR

14  THEM TO DECIDE.

15           I DON'T WANT TO STAND IN THE WAY OF THAT.  IF THEY

16  EVALUATE HIM AND SAY HEY, LOOK, YOU SMOKE POT BECAUSE THAT'S

17  FUN TO DO AS OPPOSED TO AN ADDICT THEY'RE NOT GOING TO LET HIM

18  IN.  SO I WILL DEFER TO THE BOP ON THAT.

19           MR. MACKUSICK:  I THINK THAT'S FAIR.  THEY DO MAKE AN

20  ASSESSMENT IF HE'S A GOOD CANDIDATE.

21           THE COURT:  I'M LOOKING TO SEE WHAT THE PRESENTENCE

22  REPORT SAYS ABOUT PRIOR DRUG USE.

23           MR. MACKUSICK:  ON PAGE 30, PARAGRAPH 164.

24           THE COURT:  LET'S DO IT THIS WAY.  LET'S SAY THAT THE

25  COURT RECOMMENDS THAT HE BE EVALUATED FOR POSSIBLE INCLUSION IN

1   THE INTENSIVE DRUG TREATMENT PROGRAM.

2          AND REGARDING ANY FACILITY?

3          MR. MACKUSICK:  DID YOU WANT TO GO TO MAXWELL?

4          THE DEFENDANT:  YES.

5          MR. MACKUSICK:  IF THE COURT COULD RECOMMEND THAT HE

6   GO TO MAXWELL IF HE IS ELIGIBLE TO GO THERE.

7          THE COURT:  I WILL RECOMMEND MAXWELL.

8          THE COURT:  ANYTHING FROM EITHER SIDE?

9          MR. MCBURNEY:  NO, JUDGE.

10         MR. MACKUSICK:  THANK YOU, YOUR HONOR.

11         THE COURT:  ALL RIGHT.  THAT'S ALL.

12         (PROCEEDINGS CONCLUDED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                     C-E-R-T-I-F-I-C-A-T-E
 3
 4   UNITED STATES OF AMERICA
 5   NORTHERN DISTRICT OF GEORGIA
 6
 7            I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A
 8   U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,
 9   THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND
10   ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN
11   AFORESAID.
12            IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON
13        THIS 18TH DAY OF DECEMBER, 2008.
14
15
16
17
18
19                                ANDRE G. ASHLEY
                                  OFFICIAL COURT REPORTER
20                                NORTHERN DISTRICT OF GEORGIA
21
22
23
24
25
```